IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EDWARD L. GRAY, II | NO. 1:08-cv-00778-OWW-GSA-PC |
| Plaintiff, | FINDINGS AND RECOMMENDATIONS RE DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT |
| v. | |
| D. ROBINSON, et al., | (Docs. 35, 43) |
| Defendants. | OBJECTIONS DUE IN THIRTY DAYS |

Plaintiff is a state prisoner proceeding pro se in this civil rights action. The matter was referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 302. Pending before the Court is a motion for summary judgment filed by Defendant Kushner. (ECF No. 35.) Defendants Robinson and Ortiz have also filed a motion for summary judgment. (ECF No. 43.) Plaintiff has opposed both motions.

**I.      Procedural History**

Plaintiff, an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR) at the California Men's Colony in San Luis Obispo, brings this action against defendant correctional officials employed by the CDCR at Pleasant Valley State Prison (PVSP). Plaintiff names as defendants the following individuals employed by the CDCR at Pleasant Valley State Prison (PVSP): Neil Kushner, M.D.; R. Ortiz, M.D.; Medical Technical

Assistant (MTA) D. Robinson. Plaintiff initiated this action by civil complaint filed in the Central District of California and transferred to this Court on June 5, 2008. (ECF No. 1.) The events giving rise to the claims at issue in this lawsuit occurred at PVSP. Plaintiff claims a violation of the Eighth Amendment stemming from prison officials' alleged failure to provide him with proper and/or adequate medical treatment for valley fever. On August 26, 2008, an order was entered, finding that the first amended complaint stated a claim for relief against Defendants Kushner, Ortiz and Robinson for acting with deliberate indifference to Plaintiff's medical needs. (ECF No. 7.) Defendants answered the complaint and on April 15, 2010, Defendant Kushner filed a motion for summary judgment (ECF No. 35.)[1] Defendants Robinson and Ortiz filed a motion for summary judgment on July 1, 2010 (ECF No. 43.) Plaintiff's oppositions were filed on October 25, 2010 (ECF No. 53) and December 28, 2010 (ECF No. 57.)

## II.     Summary Judgment

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

---

[1] On December 10, 2008, the Court issued and sent to Plaintiff the summary judgment notice required by Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988). (ECF No. 14.)

2

With regard to a plaintiff's motion for summary judgment, as the party with the burden of persuasion at trial, Plaintiff must establish "beyond controversy every essential element of its" his affirmative claims. S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003) (quoting W. Schwarzer, California Practice Guide: Federal Civil Procedure Before Trial § 14:124-127 (2001)). The moving party's evidence is judged by the same standard of proof applicable at trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. Rule 56(e); Matsushita, 475 U.S. at 586 n.11. The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007). Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings,

3

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

### III.     Eighth Amendment Claims

A prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety.  Farmer v. Brennan, 511 U.S. 825, 837 (1994).  The Court in Farmer adopted a subjective standard requiring an "inquiry into a prison official's state of mind" when it is alleged that a prison official was deliberately indifferent to a substantial risk.  Id. at 838 (citing Wilson v. Seiter, 501 U.S. 294, 299 (1991).  To satisfy this inquiry, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837.  Alternatively, the Court rejected any possibility that an official could be held liable for " a significant risk that he should have perceived but did not."  Id.  Even if it is determined that the official was subjectively aware of a substantial risk, the official cannot be held liable if he acted reasonably in response to that risk, "even if the harm ultimately was not averted."  Id. at 844.

In Estelle v. Gamble, 429 U.S. 97, 106 (1976), the Supreme Court held that inadequate

4

medical care did not constitute cruel and unusual punishment cognizable under section 1983 unless the mistreatment rose to the level of "deliberate indifference to serious medical needs." In applying this standard, the Ninth Circuit has held that before it can be said that a prisoner's civil rights have been abridged, "the indifference to his medical needs must be substantial. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir. 1980), citing Estelle, 429 U.S. at 105-06. Plaintiff cannot prevail in a § 1983 action where the quality of treatment is subject to dispute. Sanchez v. Veld, 891 F.2d 240 (9th Cir. 1989).

### A. **Defendant Kushner**

Plaintiff alleges that on November 24, 2004, he "got real sick with a temperature of 102.3." (Am. Compl. 4:7.) Plaintiff alleges that the on call doctor, Defendant Ortiz, treated Plaintiff for walking pneumonia and ordered blood tests for valley fever. Plaintiff tested positive for valley fever. Dr. Ortiz prescribed Diflucan for 90 days, with no further follow-up. (Am. Compl. 4:8-11.)

Plaintiff alleges that he was seen by Dr. Kushner for back pain. Dr. Kushner prescribed Motrin. Plaintiff requested further care, and Dr. Kushner "continued prescribing pain pills." Plaintiff alleges that once the prescription ran out, he did not see another doctor until a knot appeared on his neck. Plaintiff alleges that the knot "was later diagnosed as disseminated valley fever, the worst of this particular fungus, which is very deadly." (Id. 4:15-17.) Plaintiff does not indicate when he saw Dr. Kushner for back pain.

On August 2, 2005, Dr. Ortiz "called Mercy Hospital in Bakersfield for admittance," but Plaintiff was not admitted. Plaintiff alleges that Dr. Kushner "continued to order the same test over and over again." (Am. Compl. 4:20.) Dr. Kushner increased Plaintiff's dosage of Diflucan, and Plaintiff "started to experience horrible side effects." (Id. 4:22.)

In order to meet his burden on summary judgment, Defendant Dr. Kushner must come forward with evidence that he did not know of and disregard an excessive risk to Plaintiff's

5

health.

Dr. Kushner supports his motion with his own declaration. Attached as exhibits A through J to his declaration are copies of relevant portions of Plaintiff's prison medical record. Dr. Kushner declares that most people with valley fever do not require any treatment. Even when symptoms are severe, the best treatment is often bed rest and fluids. If symptoms do not improve or become worse, or if a patient is at an increased risk of complications, standard treatment includes the prescription of antifungal medications such as fluconazole (trade name Diflucan) or itraconazole (trade name Sporanox). During the course of treatment, it is common to adjust a patient's prescribed dosage of antifungal medications, depending on the severity and resiliency of the disease. Antifungal medications are also used for high-risk people or for those with chronic or disseminated valley fever. In general, the antifungal drugs Diflucan and Sporanox are used for all but the most serious cases. Antifungals can have side effects, but they usually go away once the medication is stopped. The most common side effects of Diflucan and Sporanox are nausea, vomiting, rashes, abdominal pain, and diarrhea. More serious life-threatening cases of valley fever, such as when the disease has disseminated to the spinal cord, may be treated with a more powerful antifungal medication such as amphotericin. (Kushner Decl. ¶ 8.)

Dr. Kushner first examined Plaintiff on December 15, 2004, and diagnosed Plaintiff with possible valley fever and pneumonia. Dr. Kushner ordered a blood test, chest x-ray, and prescribed Diflucan. Dr. Kushner also prescribed Albuterol, which is commonly prescribed for Patients with shortness of breath. Dr. Kushner also noted that a prescription for antibiotics for pneumonia was unnecessary as they had already been prescribed. The chest x-ray confirmed that Gray had lower left lobe pneumonia. On December 22, 2004, Dr. Kushner instructed the nurse to assess Plaintiff for disease symptoms and to send Plaintiff to the emergency room if he was sick. (Kushner Decl. ¶¶ 10-11.) The blood test results indicated that Plaintiff had a severe case of valley fever, indicating that Plaintiff should be treated with Diflucan, which Dr. Kushner had

1  already prescribed. (Kushner Decl. ¶ 13, Dft.'s's Ex. C.)

2      Dr. Kushner was next involved in Plaintiff's health care on December 27, 2004. Plaintiff
3  presented to medical complaining of pain in his right back and lower rib area. Medical staff
4  found no acute respiratory distress, and noted that Plaintiff did not have a fever and his lung
5  sounds were good. Dr. Kushner was contacted by medical staff and informed of Plaintiff's
6  condition. Dr. Kushner prescribed Tylenol and ordered that Plaintiff be seen for a follow-up in
7  ten days. (Kushner Decl. ¶ 14.)

8      Dr. Kushner next saw Plaintiff on August 8, 2005, when he examined him with respect to
9  his valley fever. Prior to the examination, Dr. Kushner reviewed Plaintiff's medical file to
10 familiarize himself with Plaintiff's medical history, as it had been almost eight months since Dr.
11 Kushner had seen Plaintiff. The review revealed that Plaintiff was seen again by medical staff
12 on December 30, 2004. Plaintiff was seen for severe pain in his back and right flank, as well as
13 difficulty breathing (it hurt to breathe deeply). Plaintiff was sent to the prison's emergency room,
14 where the physician prescribed Vicodin for the pain and Diflucan and Zithromax (an antibiotic).
15 A valley fever blood test was ordered. A follow up visit occurred on January 21, 2005. Plaintiff
16 did not have a fever or sweats. Plaintiff reported that he did not feel sick. His diagnosis
17 remained valley fever, and he was continued on Diflucan. (Kushner Decl. ¶ 17-18, Dft.'s Ex. E
18 p. 223.) A February 1, 2005, lab test indicated that Plaintiff was negative for valley fever.
19 (Dft.'s Ex. E p. 402.) [2] On March 3, 2005, Plaintiff had another follow-up with a doctor.
20 Plaintiff's condition was described as asymptomatic, meaning he had no symptoms of valley
21 fever. The diagnosis was that his valley fever was resolving and the plan was to finish the
22 current prescription for Diflucan. (Dft.'s Ex. E p. 218.)

23     Plaintiff's medical chart indicated that he was next seen on July 13, 2005. A hard mass
24 was found at the base of Plaintiff's neck and on his right testicle. Plaintiff was diagnosed with

---

[2] Page 402 of Exhibit E includes a notation that "in general, lab tests are positive in primary infections e.g. from approximately 2 weeks after infection through about the 3rd -5th month and after becoming negative, the lab test does not become positive again even after relapse or reinfection.

7

1  masses of questionable etiology along with a history of valley fever and pneumonia.  A CT scan
2  of the neck was ordered, along with an ultrasound of the scrotum and blood tests.  The blood
3  tests were positive for valley fever.  (Kushner Decl. ¶¶ 21-22, Dft.'s Ex. E, p. 401.)   When Dr.
4  Kushner saw Plaintiff on August 2, 2005, he was diagnosed with disseminated valley fever and
5  referred to Mercy Hospital for further treatment.  (Id. p. 21.)

6  Plaintiff was seen at Mercy Hospital the same day.  Plaintiff's history of valley fever was
7  noted and it was observed that Plaintiff had been doing well until about one month earlier when
8  he noticed the mass developing on his neck.  Plaintiff was diagnosed with a right neck mass.  An
9  x-ray of his neck was performed and the results were normal cervical soft tissues.  (Dft.'s Ex. E
10 p. 576.)  A CT of the cervical spine was also performed and the results found an asymmetry in
11 the area of the neck mass without a focal mass lesion being found.  (Id. p. 473.)  A chest x-ray
12 found an upper right lobe infiltrate and a possible small pulmonary nodule.  (Id. p. 577.)  Plaintiff
13 was discharged from the hospital the same day with a recommendation that he have a
14 consultation for a biopsy of the neck mass and that he be continued on Diflucan.  (Id. pp. 587,
15 589.)  Upon his return to prison the same day, Plaintiff received a prescription for Diflucan and
16 an order was written for a surgical consult for a biopsy of his neck mass.  (Id. pp. 209, 212.)

17 Dr. Kushner, aware of this treatment history, examined Plaintiff on August 8, 2005.  Dr.
18 Kushner noted the mass on Plaintiff's neck and also found a small nodule on Plaintiff's right
19 knee.  Dr. Kushner diagnosed Plaintiff with disseminated valley fever that was affecting the skin
20 and soft tissue.  Dr. Kushner requested a bone scan to evaluate Plaintiff for deeper involvement
21 that might require a prescription for Amphotericin.  Dr. Kushner also ordered a chest x-ray and
22 increased Plaintiff's dosage of Diflucan.  Plaintiff was also issued a comprehensive
23 accommodation chrono, directing that Plaintiff not be required to engage in prolonged standing,
24 lifting, or climbing for six months.  (Kushner Decl. ¶ 25, Dft.'s Ex. F.)  The results of the chest
25 x-ray were "essentially normal."   (Kushner Decl. ¶ 26.)

26 Dr. Kushner next examined Plaintiff on August 22, 2005.  Plaintiff reported that he was

28

only taking half the dosage of Diflucan that had been prescribed.  Dr. Kushner again diagnosed Plaintiff with valley fever.  Dr. Kushner noted that Plaintiff was stable with symptoms that included some skin scarring but no evidence of deeper soft tissue involvement.  Dr. Kushner ordered a follow-up examination in ten to fourteen days. (Kushner Decl. ¶ 28.)

Plaintiff was seen by Dr. Kushner on September 8, 2005.  During a review of Plaintiff's file in preparation for the examination, Dr. Kushner noted that Plaintiff had undergone a bone scan on August 23, 2005. (Dft.'s Ex. I, p. 471.)   The conclusion of the reviewing physician indicated that there was subtle abnormal activity involving the occipital skull that could represent cocci osteomyelitis, meaning valley fever that was infecting the bone.  It was also found that Plaintiff had abnormal activity in the upper jaw likely due to dental disease. (Id., Kushner Decl. ¶¶ 30 -31.)   Dr. Kushner also reviewed the results of a neck biopsy that Plaintiff had on August 26, 2005.   The diagnosis was disseminated valley fever.  Plaintiff was advised that the process of treating valley fever could be very prolonged depending on the resilience of the fungal infection.  It was also noted that the mass on Plaintiff's knee was a probable lipoma (a benign tumor composed of fatty tissue).  It was asymptomatic and the doctor performing the biopsy recommended simply observing it for the time being. (Dft's Ex. I pp. 556-57, Kushner Decl. ¶ 32.)

At the September 8, 2005, examination, Dr. Kushner noted that the results of an ultrasound of Plaintiff's scrotum was pending.  Plaintiff was diagnosed with a right testicle growth with possible removal of the growth pending the results of the ultrasound.  Plaintiff was also diagnosed with valley fever with possible dissemination to the base of the skull.  Dr. Kushner referred Plaintiff for an infectious disease consultation, and wrote an order for an MRI to address the mass at the base of the neck.   In response to the bone scan result that showed dental disease, Plaintiff was referred for a dental examination.  Plaintiff also complained of problems urinating.  In response, Dr. Kushner ordered a urinalysis.  Dr. Kushner declares that he did not find at this examination, or during any previous examination of Plaintiff, that he was

9

suffering from any side effects from his use of Diflucan. (Kushner Decl. ¶ 33.) The September 8, 2005, examination was Dr. Kushner's last occasion to examine Plaintiff. (Id. ¶ 35.)

The Court finds that Dr. Kushner has met his burden on summary judgment. Each time Dr. Kushner saw Plaintiff, he responded with what, in his medical judgment, was appropriate treatment. The evidence establishes that Dr. Kushner saw Plaintiff on December 15, 2004, August 2, 2005, August 8, 2005, August 22, 2005, and September 8, 2005. The medical evidence submitted by Dr. Kushner establishes that each time Plaintiff presented to the medical clinic, he was treated. The evidence submitted by Dr. Kushner also indicates that there is no known cure for valley fever, only antifungal medications and antibiotics to address the infection. The evidence submitted by Dr. Kushner establishes that he was not aware of any serious threat to Plaintiff's health that he failed to respond to. A review of the evidence submitted by Dr. Kushner establishes that there exists no triable issue of fact as to whether he was deliberately indifferent to Plaintiff's condition. The burden shifts to Plaintiff to come forward with evidence that Dr. Kushner was deliberately indifferent to a serious medical condition of Plaintiff's.

Plaintiff argues that "from the very beginning of his illness," he informed Dr. Kushner of his condition. Plaintiff contends that "whether the defendant would be aware of the known symptoms of valley fever is unknown to plaintiff, but even a lay person would have easily recognized the necessity to have immediately run tests to discover plaintiff's ailment." (Opp'n: 3:3-4.)   Plaintiff appears to argue that because other inmates have died due to complications from valley fever, Dr. Kushner should have known that Plaintiff was exposed to a serious medical threat. (Id. 3:18.)   Plaintiff specifically argues that

> Doctors at this facility should already be versed that when an inmate begins coughing and running a fever, it's not thought of it possibly being the flu, bronchitis or even the common cold. They immediately think valley fever, and, more often than they would like, they are right. It is apparent that the defendant, Kushner fumbled his responsibility as a physician to adequately treat plaintiff.

(Id. 3:24-4:1.) Plaintiff offers as evidence various media accounts of the presence of valley

10

fever at PVSP.  To the extent that Plaintiff is attempting to pursue an Eighth Amendment claim for the mere fact that he was confined in a location where Valley Fever spores existed which caused him to contract valley fever, he is advised that no courts have held that exposure to valley fever spores presents an excessive risk to inmate health. King v. Avenal State Prison, 2009 WL 546212, *4 (E.D. Cal., Mar 4, 2009); see also Tholmer v. Yates, 2009 WL 174162, *3 (E.D. Cal. Jan. 26, 2009)("To the extent Plaintiff seeks to raise an Eighth Amendment challenge to the general conditions of confinement at PVSP, Plaintiff fails to come forward with evidence that Yates is responsible for the conditions of which Plaintiff complaints.")  Plaintiff appears to argue that his evidence suggests the presence of valley fever.  Such evidence fails create a triable issue of disputed fact.  The presence of valley fever alone does not subject Dr. Kushner to liability under the Eighth Amendment.  Plaintiff must come forward with evidence that Dr. Kushner failed to treat Plaintiff, or in some way acted with deliberate indifference to Plaintiff's serious medical condition.  He has failed to do so here.

  Plaintiff also argues that Dr. Kushner could have been more aggressive in diagnosing and treating Plaintiff's valley fever. (Id., 4:12.) Specifically, Plaintiff contends that "it took a year before plaintiff would be admitted to the outside care of medical doctors." Id.  Mere delay in medical treatment does not constitute deliberate indifference. Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 407 (9th Cir. 1985).  Plaintiff must show the delay caused him serious harm. But see McGuckin v. Smith, 974 F.2d 1050, 1060 (9th Cir. 1992) (plaintiff not required to show "substantial harm"). In addition, a prisoner must show defendant knew aid was required, had the ability to render that aid, yet "sat idly by." Id.  In other words, deliberate indifference is a function of the seriousness of a prisoner plaintiff's medical needs and the wrongfulness of the defendant's actions in light of those needs. McGuckin, supra at 1061. Plaintiff offers no evidence to support this argument.  As noted above, Dr. Kushner has come forward with evidence that he responded to Plaintiff's medical condition.  Plaintiff offers no evidence to support his argument that a failure to immediately treat Plaintiff for valley fever, on

11

the basis that many inmates suffered from valley fever, constitutes deliberate indifference. Even if Plaintiff had come forward with evidence that Dr. Kushner should have known of the condition earlier, or that his response to Plaintiff's condition was unreasonable or negligent, his claim would fail. Mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir.1980) (citing Estelle, 429 U.S. at 105-06). See also Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir.2004).

Dr. Kushner has come forward with evidence that he responded to Plaintiff's medical condition. The evidence submitted by Dr. Kushner establishes, without dispute, that he was not deliberately indifferent to Plaintiff's serious medical condition. That Plaintiff believes Dr. Kushner should have acted sooner does not constitute evidence of deliberate indifference. Plaintiff has not met his burden of coming forward with evidence that Dr. Kushner was deliberately indifferent to Plaintiff's serious medical condition. Judgment should therefore be entered in favor of Dr. Kushner.

**B.     Defendant Robinson**

The only conduct charged to Defendant MTA Robinson is the vague allegation that "within this 14 month delay of adequate medical attention MTA Robinson, second watch MTA, delayed plaintiff medical attention by refusing him to be seen by a doctor, MTA Robinson could have simply given plaintiff medical attention by refusing him to be seen by a doctor because of his life threatening condition." (Am. Compl. 5:27-62.) Plaintiff does not specify a particular time frame.

The declaration of Defendant Robinson submitted in support of the motion for summary judgment reveals the following. At the time of the events at issue in this lawsuit, Robinson was employed at PVSP as a MTA. Robinson's duties included dispensing medications, picking up medical requests, and referring inmates to the RN. Robinson's duties did not include scheduling inmates to see physicians or other medical staff. (Robinson Decl. ¶¶ 1-2.)

Robinson was assigned to dispense medications by going cell to cell. There was no pill

line in Administrative Segregation, where Robinson worked. Robinson was informed that Plaintiff claimed that he repeatedly came to the pill line to get his medication and that on each occasion Robinson told him he did not have a prescription for him. Plaintiff also claimed that Robinson refused to call a physician to check on his prescription. Robinson declares that these encounters could not have happened because she was not assigned to the pill line, but went cell to cell to deliver medications. (Id. ¶ 5.)

Robinson declares that it is her standard practice that whenever an inmate asked about the status of a medication, she would research the matter by asking the inmate questions about the medication, checking the status of the prescription in the computer, and calling medical records and the pharmacy. She would then tell the inmate when he could expect to receive the medication or whether there was any follow-up he needed to do, such as sign up to be seen on the medical line or, to be seen by a physician who would either originate or renew the prescription. Robinson declares that she never refused to assist an inmate in researching the status of a prescription. Regarding Plaintiff's allegations, Robinson specifically declares that at no time has she ever knowingly or intentionally caused Plaintiff any pain, suffering, or injury of any kind. Robinson declares that she has never refused, or delayed, allowing Plaintiff to be scheduled to be seen by a doctor (especially since this was not one of her job duties), refused to research the status of a prescription for Plaintiff, or otherwise was deliberately indifferent to Plaintiff's medical needs. (Id. ¶¶ 5-6.)

The Court finds that Defendant Robinson has met her burden on summary judgment. The evidence submitted by Defendant Robinson establishes that Robinson could not have had an encounter with Plaintiff at the pill line, as Robinson was not assigned to the pill line. Further, the evidence indicates that Robinson has no recollection of an interaction with Plaintiff, and that she never refused to assist an inmate in researching the status of a prescription.

In his opposition, Plaintiff argues that "plaintiff's claim in a nutshell is the delay in getting medical treatment. Bringing to question did Dr. Ortiz and MTA Robinson delay plaintiff

13

access to medical treatment knowing plaintiff had a life-threatening condition (valley fever)." (Opp'n. 4:8-10.) As noted, Plaintiff alleges that Robinson delayed his treatment by refusing to schedule Plaintiff to be seen by a doctor for his valley fever.[3] In his document titled as a response to the separate statement of disputed and undisputed facts (ECF No. 61), Plaintiff indicates that Robinson refused to investigate Plaintiff's complaint regarding why he had not been prescribed the Sporanox antifungal medication. As supporting evidence, Plaintiff indicates that "discovery motion will be required to obtain the reason why there would be a 7 day delay to provide Plaintiff with Sporanox medication and medical expert testimony will be required to discover what effect the 7 day delay to treat a life threatening disease has caused." (Id. 2:19.)[4] Plaintiff also disputes Robinson's evidence that she was not working the pill line. Plaintiff clarifies his claim: "Plaintiff is not contesting what date MTA Robinson would be working in Ad-Seg. Because the incident that occurred wherein MTA Robinson refused to investigate plaintiff's claim that he had not received the prescribed Sporanox (for a life threatening disease) the past 7 days occurred prior to MTA Robinson being assigned to Ad-Seg unit 2/Delta Yard." (Id. 5:5-11.) Plaintiff alleges in his amended complaint that he was admitted to UMC for treatment of valley fever on January 13, 2006, and released on January 16, 2006. Plaintiff alleges that he "received sporanox for disseminated valley fever" on February 15, 2006. (Am. Compl.

---

[3] Plaintiff signed his amended complaint under penalty of perjury. A verified complaint in a pro se civil rights action may constitute an opposing affidavit for purposes of the summary judgment rule, where the complaint is based on an inmate's personal knowledge of admissible evidence, and not merely on the inmate's belief. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam); Lew v. Kona Hospital, 754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(e). The Court will therefore treat the amended complaint as an affidavit in opposition to the motion for summary judgment.

[4] In order to prevail on a Rule 56(f) motion to continue the motion for summary judgment in order to obtain further discovery, the party "must show (1) that they have set forth in affidavit form the specific facts that they hope to elicit from further discovery, (2) that the facts sought exist, and (3) that these sought after facts are 'essential' to resist the summary judgment motion." State of California v. Campbell, 138 F.2d 772, 779 (9th Cir. 1998). "In making a Rule 56(f) motion, a party opposing summary judgment 'must make clear what information is sought and how it would preclude summary judgment.'" Margolis v. Ryan, 140 F.3d 850, 853 (9th Cir. 1998)(quoting Garrett v. City and County of San Francisco, 818 F.2d 1515, 1518 (9th Cir. 1987). The burden is on the party seeking to conduct additional discovery to put forth sufficient facts to show that the evidence sought exists. Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1414 (9th Cir. 1987). Plaintiff fails to make the showing required.

2:19-21.)

The crux of Plaintiff's argument regarding Defendant Robinson is a failure to either investigate why Plaintiff did not receive his valley fever medication or to schedule an appointment to see a physician. As noted, the fact that Plaintiff had valley fever does not, of itself, subject Robinson to liability. There is no evidence that Plaintiff had a prescription for a medication that Robinson deliberately withheld from Plaintiff. There is no evidence that Robinson, an MTA, knew of a serious medical condition of Plaintiff's and acted with disregard to that condition. Taking Plaintiff's allegations as a declaration, Plaintiff has submitted evidence that, at most, Robinson refused to schedule Plaintiff to see a physician. As noted, the evidence submitted by Dr. Kushner establishes that Plaintiff was treated for his valley fever, and saw a physician on several occasions. The evidence here indicates, at most, a refusal to schedule Plaintiff to see a physician.

Mere delay in medical treatment constitute deliberate indifference. Shapley, 766 F.2d at 404. A plaintiff must show the delay caused him serious harm. But see McGuckin, 974 F.2d at 1060 (plaintiff not required to show "substantial harm"). In addition, a prisoner must show defendant knew aid was required, had the ability to render that aid, yet "sat idly by." Id. In other words, deliberate indifference is a function of the seriousness of prisoner plaintiff's medical needs and the wrongfulness of the defendant's actions in light of those needs. McGuckin, supra at 1061. Plaintiff offers no evidence to support this argument. Plaintiff offers no evidence to support his argument that a refusal to schedule Plaintiff to see a physician for a prescription constitutes deliberate indifference. Even if Plaintiff had come forward with evidence that Robinson should have known of the condition , or that her response to Plaintiff's condition was unreasonable or negligent, mere 'indifference,' 'negligence,' or 'medical malpractice' will not support this cause of action." Broughton v. Cutter Laboratories, 622 F.2d 458, 460 (9th Cir.1980) (citing Estelle, 429 U.S. at 105-06). See also Toguchi v. Chung, 391 F.3d 1051, 1060 (9th Cir.2004). Judgment should therefore be entered in favor of Defendant MTA Robinson.

### C. Defendant Ortiz

The following are Plaintiff's allegations regarding Dr. Ortiz: "August 2, 2005, Dr. Ortiz contacted Mercy Hospital in Bakersfield, finally attempting to provide plaintiff a higher level of care. Admittance denied." (Am. Compl. 2:8-9.)  Plaintiff alleges that Dr. Ortiz and Dr. Kushner "continued to order the same test over and over again, plaintiff symptoms continued to get worst." (Am. Compl. 4:20-21.)  Plaintiff also alleges that he was given a 90 day prescription for Diflucan in order to see if it was effective.  Plaintiff alleges that it was determined after the 90 day period that Sporanox was indicated.  Plaintiff alleges that Dr. Ortiz, along with Dr. Kushner, could have scheduled Plaintiff to be monitored once a month instead of waiting for 90 days. (Am. Compl. 5:18.)

Dr. Ortiz supports his motion for summary judgment with his declaration.  Attached as exhibits to Dr. Ortiz's declaration are copies of Plaintiff's medical records.  Plaintiff was first seen by Dr. Ortiz on November 24, 2004.  Plaintiff presented to the emergency room complaining of a fever, cough, and shortness of breath for five days.  Dr. Ortiz diagnosed Plaintiff with pneumonia and prescribed several medications, including two antibiotics. (Ortiz Decl. ¶ 10.)  Plaintiff was seen by Dr. Kushner on December 15, 2004.  Dr. Kushner diagnosed Plaintiff with possible valley fever and pneumonia. (Ortiz Decl. ¶ 11, Ex. B.)  Dr. Kushner ordered a valley fever blood test and prescribed Diflucan. (Id. , Angus Decl. Ex. A, Kushner Decl. Ex. B.)

Plaintiff was next seen by Dr. Ortiz on January 7, 2005, for follow-up of possible valley fever.  Plaintiff's chest x-ray and blood test results were unavailable for review by Dr. Ortiz. (Ortiz Decl. ¶ 13, Ex. D.)  Dr. Ortiz's treatment plan on January 7, 2005, was to continue the Diflucan treatment, repeat of the valley fever blood test in a couple of weeks, and reevaluate Plaintiff's condition at that time. (Id.)  On January 11, 2005, Dr. Ortiz received and reviewed Plaintiff's valley fever blood test results, and the report indicated Plaintiff was then positive for valley fever.  Since Plaintiff had already been prescribed Diflucan, there was nothing else to do

16

1   other than to continue monitoring Plaintiff's condition. (Ortiz Decl. ¶ 14.)

2   Plaintiff was seen again by Dr. Ortiz on January 21, 2005, for follow-up of the valley
3   fever blood test results. Dr. Ortiz told Plaintiff that the blood test came back positive for valley
4   fever and that the treatment plan was to continue Diflucan at the same dosage and monitor his
5   condition through repeating the valley fever blood test. (Ortiz Decl. ¶ 15, Ex. F.)  Dr. Ortiz
6   saw Plaintiff again on March 3, 2005, at which time Plaintiff was asymptomatic with a negative
7   valley fever test. (Id.) Dr. Ortiz's diagnosis was that the valley fever was resolving, and the
8   treatment plan was for Plaintiff to continue taking the Diflucan. (Ortiz Decl. ¶ 16, Ex. G.)

9   On July 13, 2005, Plaintiff was evaluated by another PVSP physician. Plaintiff
10  complained to that physician of having several lumps on his neck and one on his knee. An
11  examination on July 13, 2005, revealed a 3 cm by 4 cm hard mass on the base of Plaintiff's neck
12  and a mass to his right testicle, and the diagnoses were masses of questionable etiology with a
13  history of valley fever pneumonia. The examining doctor recommended a CT scan of Plaintiff's
14  neck, an ultrasound of the scrotum, and blood tests. (Ortiz Decl. ¶ 17, Ex. H.)

15  Plaintiff was seen by Dr. Ortiz on August 2, 2005, for a follow-up and a surgical consult
16  regarding the masses. Dr. Ortiz diagnosed Plaintiff with disseminated valley fever and referred
17  him to Mercy Medical for a surgical consult with the dermatology clinic and an infectious disease
18  specialist for treatment of the disseminated valley fever. (Ortiz Decl. ¶ 18 Ex, I.) Dr. Ortiz did
19  not see Plaintiff after August 2, 2005. (Ortiz Decl. ¶ 20, Ex. J.)

20  Defendant Ortiz also submits the declaration of Dr. F. Igbinosa, M.D. in support of his
21  motion for summary judgment. Dr. Igbinosa is employed as the Chief Medical Officer at PVSP.
22  Dr. Igbinosa declares that of all persons who test positive for valley fever, approximately sixty
23  percent are able to fight the infection naturally and suffer no symptoms whatsoever. Of the forty
24  percent who do develop symptoms, approximately ninety percent will only experience mild flu-
25  like symptoms or uncomplicated pneumonia. Only five to ten percent of those who will develop
26  symptoms will suffer from complicated pneumonia, and only 0.5 to one percent of those showing

27
28                                      17

symptoms will experience dissemination. (Igbinosa Decl. ¶ 11.)  Regarding Plaintiff's treatment by Dr. Ortiz, Dr. Igbinosa declares the following:

> In making this declaration, I have reviewed inmate Gray's medical file for the period of June 2004 through June 2006, and I am familiar with his medical history.  Based upon my review of Mr. Gray's medical records, it is my medical opinion that Dr. Ortiz provided Mr. Gray with medical care consistent with community standards.  Dr. Ortiz initially made a correct diagnosis of pneumonia, provided appropriate treatment for pneumonia, appropriately ordered further testing, and scheduled a follow-up appointment for Mr. Gray.  Additionally, during Dr. Ortiz's subsequent visits with Mr. Gray, Dr. Ortiz correctly diagnosed Mr. Gray with valley fever and provided appropriate treatment of prescribing antifungal medication, recommending regular follow-up visits and valley fever blood tests.   Based upon my review of Mr. Gray's medical records, this treatment was effective as Mr. Gray's January 31, 2005, valley fever blood test was negative.  Finally, when it appeared that Mr. Gray's valley fever returned and had disseminated in July 2005, Dr. Ortiz appropriately referred Mr. Gray to an infectious disease specialist.

(Igbinosa Decl. ¶ 20.)

The Court finds that Defendant Ortiz has met his burden on summary judgment.  The evidence establishes that Dr. Ortiz responded appropriately to Plaintiff's medical condition.  That valley fever had infected numerous inmates and staff at PVSP does not create a serious medical condition that required Dr. Ortiz to immediately treat Plaintiff for valley fever.   The evidence submitted by Dr. Ortiz establishes that he followed proper medical protocol in evaluating, diagnosing and treating Plaintiff.  The burden shifts to Plaintiff to come forward with evidence of a triable issue of fact - evidence that Dr. Ortiz knew of and was deliberately indifferent to a serious medical need of Plaintiff's.

In his opposition, Plaintiff argues that his "claim in a nutshell is the delay in getting medical treatment.  Bringing to question did Dr. Ortiz and MTA Robinson delay Plaintiff access to medical treatment, knowing plaintiff had a life-threatening condition (valley fever)." (Opp'n. 4:8-10.)  Plaintiff fails to offer evidence that establishes a triable issue of fact as to whether Dr. Ortiz knew of and disregarded Plaintiff's serious medical condition.   It is undisputed that Plaintiff suffered from valley fever.  As noted above, Dr. Ortiz can not be held liable solely on

18

the ground that Plaintiff was exposed to valley fever. Plaintiff appears to argue that he should have been treated sooner. Taking the allegations of the complaint as evidence in the form of a declaration, Dr. Ortiz continued to order the same test over and over again as Plaintiff's symptoms began to worsen. Dr. Ortiz has come forward with evidence that his response to Plaintiff's condition was appropriate. Dr. Ortiz twice continued Plaintiff on Diflucan. The evidence submitted by Dr. Ortiz indicates that the lab tests showed that the valley fever was resolving, and Plaintiff was continued on Diflucan. At that point, there was no other indicated treatment. The evidence submitted by Plaintiff indicates, at most, a disagreement with the course of treatment. Plaintiff cannot prevail in a section 1983 action where only the quality of treatment is subject to dispute. Sanchez v. Vild, 891 F.2d 240 (9th Cir. 1989). Mere difference of opinion between a prisoner and prison medical staff as to appropriate medical care does not give rise to a section 1983 claim. Hatton v. Arpaio, 217 F.3d 845 (9th Cir. 2000); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

**IV.    Conclusion**

Defendants Kushner, Robinson and Ortiz have submitted evidence that establishes, without dispute, that Plaintiff was treated for his valley fever. The evidence establishes that Plaintiff was tested, diagnosed with valley fever, and prescribed appropriate treatment. Subsequent tests indicated that the valley fever was resolving, and Plaintiff was continued on treatment. Further testing indicated that the valley fever had disseminated and Plaintiff was sent for further treatment and a surgical consultation. Plaintiff has not come forward with any evidence that any of the defendants acted with deliberate indifference to Plaintiff's condition. Plaintiff's central argument seems to be that if defendants had treated him sooner, he would not have suffered disseminated valley fever. However, Plaintiff offers no evidence that any other course of treatment was indicated. Judgment should therefore be entered in favor of Defendants Kushner, Robinson and Ortiz and against Plaintiff.

Accordingly, IT IS HEREBY RECOMMENDED that the motions for summary judgment

by Defendants Kushner, Robinson and Ortiz be granted, and judgment be entered in favor of Defendants and against Plaintiff.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.   The parties are advised that failure to file objections within the specified time waives all objections to the judge's findings of fact.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated:**   **February 4, 2011**               /s/ **Gary S. Austin**
                                           UNITED STATES MAGISTRATE JUDGE

20